## Armolt v. Buhrow

C.P. of Cumberland County, no. 4795 Civil 1996.

*Douglas H. Gent,* for plaintiffs.
*Philip J. Murren,* for defendants.

BAYLEY, *J.,* January 3, 1997—

## ISSUES

Plaintiffs, whose memberships were terminated in the Calvary Temple Church of Carlisle, Pennsylvania, filed a complaint in equity on August 28, 1996, and later an amended complaint, against the following defendants: Pastor Raymond Buhrow, the church deacons,[1] and Calvary Temple Church of Carlisle, Pennsylvania, a nonprofit Pennsylvania corporation. Following hearings on September 10 and 11, 1996, a preliminary injunction supported by a written opinion was entered on September 18, 1996. That injunction provided inter alia:

"(2) *Defendants shall not restrain or restrict plaintiffs from peaceably exercising their full rights and privileges*

---

1. There are two deacons, one of whom is also the church treasurer, and the other the secretary.

*as members of Calvary Temple Church* including their access to church property *pending further order of this court following an adjudication.*

"(3) Pending a further order of this court following an adjudication, defendants shall not alienate, dissipate, disburse, transfer, sell, incumber or conceal any of the assets of the Calvary Temple Church; provided however, that the church treasurer shall be permitted to pay all ordinary and routine expenses of the church, including the pastor's salary and support for missionaries, and to pay any necessary maintenance and repairs to church property, and to receive and deposit all revenues of the church in the church's existing operating accounts." (emphasis added)

Defendants filed an appeal from the preliminary injunction to the Superior Court of Pennsylvania. The appeal was transferred to the Commonwealth Court and is pending. On December 4, 1996, this court conducted a hearing to (1) adjudicate plaintiffs' amended complaint in equity and (2) resolve defendants' outstanding petition to vacate the preliminary injunction.[2] The parties stipulated that the record of the hearings on the preliminary injunction is incorporated into and made a part of the record of this adjudication. Plaintiffs seek the following relief: (1) their reinstatement as members of the Calvary Temple Church of Carlisle, Pennsylvania; (2) a declaration that the bylaws and constitution of the church are void; (3) a declaration that the offices of deacon, treasurer and secretary are vacant; (4) an order directing the holding of an organizational

---

2. Although there is a pending appeal from the entry of the preliminary injunction, the parties agree that continuing jurisdiction is vested in this court by Pennsylvania Rule of Appellate Procedure 311(h). See *Izenson v. Izenson*, 274 Pa. Super. 356, 418 A.2d 445 (1980).

meeting pursuant to the Nonprofit Corporation Law of 1988 to approve corporate bylaws and elect a board of directors (deacons);[3] and (5) the appointment of a master to conduct the organizational meeting. In the alternative, plaintiffs seek a declaration that there is an irreconcilable split in the membership of the church which warrants an award of the control of all church assets to plaintiffs who are in the majority.[4] Defendants seek a dismissal of plaintiffs' amended complaint and an order vacating the preliminary injunction entered on September 18, 1996. Post-hearing briefs were filed and the issues were argued on December 10, 1996.

## CHRONOLOGICAL STATEMENT OF FACTS

On February 14, 1996, the membership of the Calvary Temple Church voted to appoint as pastor, Raymond Buhrow, who is ordained by the World Pentecostal Mission. Pastor Buhrow succeeded Pastor Harold Jones, who had resigned in January 1996, after ministering at Calvary Temple for almost 28 years. Calvary Temple is a small, independent church with many farmers as members. Shortly after Pastor Buhrow came to Calvary Temple Church, he suggested that the church incorporate. He told the deacons that one of the main reasons he favored incorporation was to protect the church and the deacons in case of lawsuits. Pastor Buhrow obtained proposed bylaws and a church constitution and reviewed those documents with the deacons on April 13. The

3. 15 Pa.C.S. §5101 et seq.

4. Those assets are a church building, parsonage, social hall and support structures on approximately four acres, an unimproved four acre lot across the street from the church, a general account containing $15,139, a missions account containing $9,800, and a $30,000 certificate of deposit.

unincorporated church had a constitution and bylaws that were adopted in 1983.

At an April 16 meeting of the church membership for which there was notice, the members unanimously approved the nonprofit incorporation of the church, a new constitution and new bylaws. Pastor Buhrow selected himself, the church treasurer Gerald L. Day, and the secretary Irene G. Day, as incorporators.[5] Following the April 16 membership meeting, the incorporators signed articles of incorporation of Calvary Temple Church of Carlisle, Pennsylvania, with paragraph 9 of the articles stating the effective date of April 16, 1996, at 9 p.m. No directors were named in the articles. The articles were sent to the Pennsylvania Department of State and filed on April 23. Thereafter, no organizational meeting of the corporation was ever held, no directors were appointed nor were any bylaws adopted.

On June 4, 1996, acting upon concerns expressed by some church members, the four church deacons prepared a list of 10 items that they asked Pastor Buhrow to discuss with them on June 6. The list included such concerns as the way Pastor Buhrow conducted Sunday night youth service, whether there should be a family night, the organization and direction of the social hall, the length of services, how the choir director was appointed, and whether music played during services was too loud. One of the general items was:

"The pace of changes that are being implemented in our church—changes are hard to take and there has been numerous changes over the past few months that the pastor has installed. We definitely want to slow down some of that. There has been numerous complaints. We know some people just don't like change

---

5. The Days are plaintiffs herein.

and we are not reacting to that. Change for change sake is not good in our opinion and we would like the change of pace to slow down."

Pastor Buhrow refused to discuss a single item with the deacons. He believed that the deacons had wrongfully met behind his back, were attempting to usurp his authority, and were counseling members who should have come to him for counsel. Pastor Buhrow dismissed one deacon on the spot. Another deacon resigned later that evening. The next day the pastor dismissed the two remaining deacons. Plaintiffs, whom Pastor Buhrow characterizes as dissidents, were shocked by his conduct. They withheld their tithes, which generally had been 10 percent of income, and they started to worship together at one of their homes. On July 3, Pastor Buhrow started initial steps to discipline the dissidents by visiting or attempting to visit each member and their families on two separate occasions. He told plaintiffs that because they had rebelled against their pastor and the bylaws of the church, and had withheld their tithes, they would have to repent their sin and esteem [show respect to] him. Plaintiffs did neither to the pastor's satisfaction.

At an evening service on July 24, Pastor Buhrow became concerned when many of the dissidents congregated in the parking lot before entering the church. At the end of the service, Pastor Buhrow was confronted in the pulpit and felt threatened by the conduct of one of the dissidents, whom he believed the others were encouraging. Pastor Buhrow called the state police, who came and stayed in the parking lot until the dissidents left the church property. Pastor Buhrow concluded that there was a rebellion that jeopardized his personal safety and the order of the church. Following the service, Pastor Buhrow proceeded with formal discipline of each dissident, which concluded with a meeting of the new

church board members, whom he appointed. No hearing was provided to any plaintiff. Acting as a disciplinary committee, the pastor and the board expelled 31 persons from Calvary Temple Church. On July 28, constables delivered notices to the terminated members as they arrived for services, barring them from entering the church property upon threat of criminal prosecution. The number of members of the church before the expulsions was 56, leaving 25 members afterward. Of the 31 members expelled, 28 are plaintiffs in this case.

Following the entry of the preliminary injunction on September 18, some plaintiffs resumed attending church services at Calvary Temple. Some plaintiffs made efforts to reconcile with other church members. Efforts by some plaintiffs to arrange a meeting with other church members failed because plaintiffs did not want Pastor Buhrow present, and the other members would not meet without the pastor being present. Plaintiffs are not willing to meet Pastor Buhrow's demands for reconciliation. Notwithstanding the entry of the preliminary injunction, defendants mailed notices to plaintiffs on October 19 of a disciplinary hearing before the church board on October 27. Plaintiffs did not attend those hearings, which were conducted by Pastor Buhrow and the deacons. The only reason plaintiffs were not again expelled from the church was the restraint of the prohibition of the preliminary injunction. Plaintiffs stopped attending services at Calvary Temple Church after they received the notices of the disciplinary proceedings. They continue to meet to worship in one of their homes.

## DISCUSSION

Section 5308 of the Nonprofit Corporation Law of 1988 provides, "The articles of incorporation shall be filed in the Department of State." Section 5309 provides,

*"Upon the filing of the articles of incorporation in the Department of State, the corporate existence shall begin."* (emphasis added) Section 5310(a) sets forth:

*"General rules.*—After the filing of the articles of incorporation, an organization meeting of the initial directors, or if directors are not named in the articles, of the incorporator or incorporators, *shall be held,* within or without this Commonwealth, *for the purpose of adopting bylaws,* which they shall have authority to do at such meeting, *of electing directors to hold office as provided in the bylaws, if directors are not named in the articles,* and the transaction of such other business as may come before the meeting. *A bylaw adopted at such meeting of directors or incorporators shall be deemed to be a bylaw adopted by the members for the purposes of this article and of any other provision of law."* (emphasis added)

Plaintiffs maintain that the bylaws and constitution adopted by the membership on April 16, 1996, just prior to the beginning of the corporate existence, are void because the incorporators did not thereafter hold an organizational meeting and never adopted bylaws or elected directors. Following adoption of the new bylaws and constitution on April 16, Pastor Buhrow, the deacons and the church members all considered those documents as the governing documents of the church, and the documents were utilized for that purpose. Defendants maintain that since the new bylaws and constitution were intended to constitute the governing documents of the church, they are the governing documents of the church. They further maintain that the bylaws are constructively the corporate bylaws, notwithstanding that they were not readopted after the articles of incorporation were filed on April 23.

We agree with the plaintiffs that under section 5308 of the Nonprofit Corporation Law of 1988, the incorporation of Calvary Temple Church did not take place until the articles of incorporation were filed with the Department of State on April 23, 1996. We, however, do not agree with plaintiffs that the bylaws and constitution adopted by the membership on April 16 just prior to the beginning of the corporate existence, are void. Plaintiff Gerald L. Day, one of the incorporators of the church, acknowledged that he and the other incorporators would not have been free to adopt different corporate bylaws given (1) the approval of the membership of the bylaws on April 16, 1996; (2) the intent of the membership that those bylaws would constitute the corporate bylaws of the church; (3) that the membership considered the bylaws valid after incorporation on April 23, 1996; and (4) that actions were taken pursuant to those bylaws after April 23. On these unique facts, we agree with defendants that notwithstanding the procedural error in not complying with section 5310(a) of the Nonprofit Corporation Law, the bylaws adopted unanimously by the membership on April 16, 1996 are constructively the corporate bylaws.

Furthermore, we disagree with plaintiffs' conclusion that because the incorporators have not readopted the bylaws after April 23, that Calvary Temple Church is without a valid constitution. The church constitution, approved by the membership on April 16, states that it is for the "Calvary Temple Church of Carlisle, PA." It further states, "This constitution and bylaws supersedes any other constitutions and/or bylaws of [the] church." Thus, the failure of the incorporators to meet and readopt bylaws and appoint directors subsequent

to the beginning of corporate existence on April 23 does not abrogate the constitution adopted by the church membership on April 16. That document clearly supersedes the 1983 constitution and is now an operative legal document governing the Calvary Temple Church as are the new constructively adopted bylaws. It was the failure of Pastor Buhrow and the deacons to comply with the provision in article II, section 4 of the constitution of Calvary Temple Church that mandates a hearing as a prerequisite before the termination of any of plaintiffs' memberships, that was the legal basis upon which plaintiffs' memberships were restored by the preliminary injunction entered on September 18. For plaintiffs to maintain that the constitution whose provisions formed a basis for that preliminary relief is now void, defies the logic represented in the legal maxim, allegans contraria non est audiendus. As expressed by Lord Kenyon, a man shall not be permitted to blow hot and cold with reference to the same transaction, or insist, at different times, on the truth of each of two conflicting allegations according to the promptings of his own private interest.[6] As set forth by the Commonwealth Court of Pennsylvania in *Ligon v. Middletown Area School District,* 136 Pa. Commw. 566, 584 A.2d 376 (1990):

"Pursuant to the doctrine of judicial estoppel, a party to an action is estopped from advocating a position inconsistent with his or her position in a previous action if the prior position was successfully maintained. . . . Certainly, this doctrine would apply with equal if not greater force when a party switches positions within the same action. *Id.* at 573, 584 A.2d at 380. (citations omitted)

---

6. Broom's Legal Maxims 103 (10th ed. 1939).

The limited basis for judicial intervention into the affairs of a church was reviewed by the Supreme Court of Pennsylvania in *Presbytery of Beaver-Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317 (1985). The issue was whether members of a local church which had been affiliated with a national denomination could retain ownership of the assets and property of the local church after terminating their membership in the national denomination. A trial court in equity entered judgment in favor of the local church, finding no agreement of trust in the local church's constitution that placed church property in the control or ownership of the national denomination. That judgment was reversed by the Commonwealth Court; however, it was reinstated by the Supreme Court of Pennsylvania. The Supreme Court stated that a dispute among members of a religious denomination over ownership of church property is not without precedent. The court noted the "deference rule" set forth by the Supreme Court of the United States in *Watson v. Jones,* 80 U.S. 679 (1871):

*"[W]henever the questions of discipline, or of faith, or ecclesiastical rule,* custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the case before them." (emphasis in original)

However, citing *Presbyterian Church in the United States v. Blue Hull Memorial Church,* 393 U.S. 440 (1969), the Supreme Court of Pennsylvania stated:

"All disputes among members of a congregation, however, are not doctrinal disputes. Some are simply disputes as to the meaning of agreements on wills, trusts, contracts, and property ownership. These disputes are questions of civil law and are not predicated on

any religious doctrine. *While it is true that parties may agree to settle their disputes according to their own agreed fashion, the question of what they agreed to, or whether they agreed at all, are not doctrinal and can be solved without intruding into the sacred precincts. From this consideration has evolved what is called the 'neutral principles approach' delineated in Presbyterian Church in the United States v. Blue Hull Memorial Church, [supra] where the rule was carefully announced.*

"Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, *Abington School District v. Schempp,* 374 U.S. 203 [83 S.Ct. 1560, 10 L.Ed.2d 844] (1963);

*the amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine."* (emphasis added)

The Supreme Court then framed the issue in the *Presbytery* case:

"It is exactly these principles of deference and neutrality that compete in the instant case. [The Presbytery] insists upon the principle of deference, arguing that they are the final ecclesiastical tribunal, and hence their decision binds. [In determining whether its agreement with the local church placed the property of the church in its trust], [the local church] argues that they never subscribed to an agreement surrendering their property to the national church, and submit that under neutral principles the question is not doctrinal but a civil question of trust and contract." *Id.* at 264, 489 A.2d at 1322.

The Supreme Court noted that while courts may not inquire into ecclesiastical questions, they are not proscribed from entering and resolving disputes if such can be resolved by the application of "neutral principles of law." The court upheld the order of the trial judge who had interpreted the church constitution as not reflecting an intent to convey a property interest to the national denomination. The court's holding involved no inquiry into ecclesiastical questions but was based upon the same principles of law as would be applied to nonreligious associations.

In the case *sub judice,* plaintiffs characterize the central issue as a dispute over the control of the assets and property of Calvary Temple Church. We disagree. The central issue in this dispute is over the *procedure* utilized to terminate plaintiffs' membership in the church.[7] The preliminary injunction was entered because

---

7. As contrasted to the *reasons* for the terminations which clearly involve ecclesiastical issues.

Pastor Buhrow and the deacons failed to comply with article II, section 4 of the constitution of Calvary Temple Church that mandates a hearing before the discipline committee (the pastor and the deacons), may then meet and vote on terminating a person's membership in the church.[8] Plaintiffs are thus entitled to a continuation of the relief granted in the preliminary injunction to the extent that their reinstated memberships in Calvary Temple Church may not now be terminated without full compliance with all of the provisions in article II, section 4. As stated in the opinion in support of the preliminary injunction, "The church constitution's clear and unambiguous mandate [requiring hearings as part of the disciplinary process] involves no ecclesiastical interpretation; it can be interpreted upon the same neutral principles of law as would be applied to a nonreligious association." The reinstatement of plaintiffs' memberships, therefore, is appropriately within this court's jurisdiction to grant pursuant to *Presbyterian Church in the United States v. Blue Hull Memorial Church, supra.*

We thus hold that the terminations of plaintiffs' memberships in Calvary Temple Church are legally flawed under the provisions of the church constitution, and are therefore void. Plaintiffs are therefore entitled to injunctive relief. Any future action to terminate plaintiffs' membership in the church *must start anew* under all of the provisions of article II, section 4. Furthermore, the action of defendants in conducting a second round of disciplinary proceedings during the pendency of the preliminary injunction violated the restraints on defendants imposed in paragraph 2 of that injunction. Defendants' action was designed to restrain plaintiffs from

8. See opinion in support of preliminary injunction dated September 18, 1996, pp. 8, 9 and 10. That opinion is incorporated herein and made a part of this opinion.

exercising their full rights and privileges as *members* of Calvary Temple Church *"pending further order of this court following an adjudication."* Therefore, that action is void.

We further hold that plaintiffs are not entitled to a judicial order of intervention in the governance of Calvary Temple Church because the church has a constitution and bylaws that set forth such procedures. It is of no consequence that there is a split in the membership of the church. *All members,* as well as Pastor Buhrow, are subject to the constitution and bylaws. Assuming that all parties abide by the governing provisions in the constitution and bylaws which do not involve ecclesiastical interpretation, the church members, which include plaintiffs, can govern their own affairs without judicial intervention.[9]

As to defendants' petition to vacate the preliminary injunction, the restraints imposed in paragraph 3 involving the financial matters of the church will not be continued. There is no evidence to support any allegation that defendants have acted improperly with respect to the financial management of the church.

## DECREE NISI

And now, January 3, 1997, it is decreed:

(1) The preliminary injunction entered on September 18, 1996, is vacated and replaced with this adjudication of injunctive relief.

---

9. For example, article VII of the constitution and the seventh bylaw set forth procedures for the amendment of those documents. Article VI, section 2 of the constitution provides that: "special meetings may also be called by petition having been signed by not less than one-half of the active membership of Calvary Temple Church, the petition to be placed in the hands of the pastor and announced two Sundays prior to the date of the meeting."

58

(2) All action taken to date to terminate the memberships of plaintiffs in the Calvary Temple Church, is null and void.

(3) Plaintiffs' memberships in Calvary Temple Church are reinstated.

(4) Any future action to terminate the membership of any plaintiff in Calvary Temple Church must start anew in accordance with the constitution and bylaws of the church.

(5) All other relief requested in plaintiffs' amended complaint, is denied.